# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DORCAS R. JONES,         )
                                )
         Plaintiff,       )
                                )
     v.                  )    Civil Action No. 20-1074-SRF
                                )
KILOLO KIJAKAZI,[1]       )
Acting Commissioner of Social Security,   )
                                )
         Defendant,      )
                                )

## MEMORANDUM OPINION[2]

Plaintiff Dorcas R. Jones ("Plaintiff") filed this action pursuant to 42 U.S.C. §§ 405(g) on August 18, 2020 against the defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration (the "Commissioner"). (D.I. 2) Plaintiff seeks judicial review of the Commissioner's May 20, 2019 final decision denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–433. Currently before the court are cross-motions for summary judgment filed by Plaintiff and the Commissioner.[3] (D.I. 22; D.I. 28) For the reasons set forth below, I recommend that the court DENY Plaintiff's motion for summary judgment (D.I. 22), and GRANT the Commissioner's cross-motion for summary judgment (D.I. 28).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi is substituted as Defendant in place of Andrew Saul.
[2] On December 9, 2021, the parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this matter through final judgment, pursuant to 28 U.S.C. § 636(c). (D.I. 24)
[3] The briefing on the pending motions is found at D.I. 23, D.I. 30, and D.I. 31.

## I.   BACKGROUND

### A.  Procedural History

Plaintiff protectively filed an application for DIB on April 5, 2017, alleging a disability onset date of January 18, 2017 due to panic attacks, agoraphobia, restlessness, generalized anxiety disorder, and extreme anxiety.  (D.I. 11 at 183-85, 210)  Plaintiff's claims were denied initially in June 2017 and upon reconsideration in December 2017.  (*Id.* at 78, 93)  At Plaintiff's request, an administrative law judge ("ALJ") held a hearing on May 2, 2019.  (*Id.* at 48-77)  The ALJ issued an unfavorable decision on May 20, 2019, finding that Plaintiff was capable of a full range of work at all exertional levels, with some nonexertional limitations.  (D.I. 11 at 14-24) The Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 5-7)

Plaintiff brought this civil action challenging the ALJ's decision on August 18, 2020. (D.I. 2)  Plaintiff filed the pending motion for summary judgment on December 9, 2021 (D.I. 22), and the Commissioner cross-moved for summary judgment on March 11, 2022 (D.I. 28). Briefing is now complete on the pending motions.

### B.  Medical History

Plaintiff was 44 years old on her alleged disability onset date of January 18, 2017.  (D.I. 11 at 23)  The ALJ found that Plaintiff had the following severe impairments: panic attacks, agoraphobia, generalized anxiety disorder, and depressive disorder.  (*Id.* at 17)  The court focuses its summary of the medical evidence on the records relevant to the challenges raised by Plaintiff.  Plaintiff's appeal is largely focused on whether the ALJ's determination of Plaintiff's residual functional capacity ("RFC") accounts for functional limitations related to Plaintiff's

2

agoraphobia.[4]

### 1. Medical evidence

Beginning in February 2015, Plaintiff saw Nadeem Afzal, M.D. for psychiatric treatment. (D.I. 11 at 460)  At the time, Dr. Afzal indicated that Plaintiff wanted to stop taking her psychiatric medications and switch completely to herbal supplements, and she reported that her symptoms were under control with the combination of Zoloft and herbal supplements.  (*Id.*)  Dr. Afzal observed signs of anxiety and moderate depression, but her behavior was otherwise normal.  (*Id.* at 461)  Subsequent treatment notes through the end of 2015 disclosed stable findings, partial treatment response to medication, and no medication side effects.  (*Id.* at 463-72)  By 2016, she was showing no signs of depression or anxiety, and she began tapering her Zoloft dosage in November 2016.  (*Id.* at 473-87)  However, she experienced anxiety and withdrawal symptoms in early 2017 as a result of the tapering, and Dr. Afzal restarted her Zoloft prescription.  (*Id.* at 488)

Plaintiff visited the emergency room on January 18, 2017 due to an acute panic attack, and she was discharged with a prescription for Xanax and instructions to follow up with Dr. Afzal.  (D.I. 11 at 283, 288-89)  The following day, Dr. Afzal observed that Plaintiff's anxiety symptoms were worse.  (*Id.* at 491)  He increased her Zoloft dosage and instructed her to start taking Xanax as well.  (*Id.* at 492)  Plaintiff's symptoms continued to get worse that month, and she expressed concern that she would lose her job.  (*Id.* at 495)

---

[4] The U.S. Department of Health and Human Services, National Institute of Mental Health defines "agoraphobia" as "an anxiety disorder that involves intense fear and anxiety of any place or situation where escape might be difficult.  Agoraphobia involves avoidance of situations such as being alone outside of the home; traveling in a car, bus, or airplane; or being in a crowded area."  *See* https://www.nimh.nih.gov/health/statistics/agoraphobia (last visited on April 4, 2022).

In early February, Plaintiff indicated that her panic attacks and anxiety had improved, although she still appeared very anxious. (D.I. 11 at 498) Dr. Afzal increased her Zoloft dosage. (*Id.*) On February 13, 2017, she was voluntarily admitted to the Rockford Center for five days due to worsening anxiety and panic attacks. (*Id.* at 364-69) There, her Zoloft and Xanax prescriptions were discontinued, and she was switched to Prozac, Klonopin, gabapentin, and Seroquel. (*Id.* at 367) Upon her discharge, she was not anxious and was clinically stable, with a discharge prognosis of "fair." (*Id.* at 368-70) Subsequent treatment notes from Dr. Afzal indicate that Plaintiff showed a partial treatment response and her anxiety improved overall, but she still showed signs of anxiety and her Prozac dosage was increased. (*Id.* at 501, 504, 507, 510)

Plaintiff also saw psychotherapist John Stephen Parker, M.S., L.P.C. from February to May of 2017. (D.I. 11 at 373-96) Mr. Parker's notes describe Plaintiff's self-reports about her anxiety and panic attacks, with a consistent focus on her interpersonal difficulties. (*Id.*) Plaintiff suggested that she should only drive or perform activities of daily living at times when she has no anxiety. (*Id.* at 381)

Plaintiff reported having panic attacks and worsening anxiety in May 2017 as a result of relationship difficulties, which interfered with her ability to walk, write, and do laundry. (D.I. 11 at 514, 517, 520) Dr. Afzal indicated that Plaintiff was experiencing anxiety and moderate depression, and he increased her Prozac dosage again. (*Id.*) Plaintiff also visited her primary care provider, nurse practitioner Roberta Beiso, for her anxiety and depression between May and July 2017. (*Id.* at 599-604, 606-07) During a visit in June, Plaintiff's care provider reported that she was tearful and upset throughout the appointment, although she was not experiencing a crisis situation at the time. (*Id.* at 604)

4

Plaintiff's mood had improved by mid-July. (D.I. 11 at 599-601) Days later, however, Dr. Afzal reported that Plaintiff had experienced a setback resulting in tearfulness, increased panic attacks, and reduced ability to function independently. (*Id.* at 522) Dr. Afzal increased Plaintiff's dosage of Prozac and, although Plaintiff reported that the increase resulted in a skin rash, Dr. Afzal continued her on the higher dosage. (*Id.* at 522-23, 525-26)

In September 2017, Plaintiff reported taking additional Klonopin to control her anxiety, which then led to side effects including memory loss. (D.I. 11 at 529) After Dr. Afzal began to taper Plaintiff's Klonopin dosage, Plaintiff reported that she was still anxious but she did not have as many panic attacks. (*Id.* at 529-34, 566, 568, 570) Plaintiff asked to further taper her Klonopin during her visit with Dr. Afzel on January 16, 2018, and her treatment notes confirmed that she was less anxious at that time. (*Id.* at 564) By April 2018, Plaintiff reported that she could only function for two hours each day due to her anxiety, but she wanted to stop taking her medication because of side effects including fatigue, memory issues, constipation, and tingling sensations. (*Id.* at 554-60)

Dr. Afzal further reduced her Klonopin dosage in July 2018, despite persistent signs of anxiety and mild depression, because she planned to start working ten hours per week. (D.I. 11 at 550) Contemporaneous treatment notes from Ms. Beiso indicated that Plaintiff "feels well with no complaints" and "sleeps 8 hours per night." (*Id.* at 594) Plaintiff exhibited no signs of anxiety and depression at the time, and Ms. Beiso completed a health appraisal form on Plaintiff's behalf as she sought employment in a childcare facility. (*Id.* at 593-94)

During a visit with Dr. Afzel in September 2018, Plaintiff indicated that she had adjusted to working for fourteen hours per week. (D.I. 11 at 546) However, she reported experiencing severe withdrawal symptoms every time her medication dosages were reduced, and Dr. Afzel

indicated that she was tearful and showed signs of severe depression. (*Id.*) Nonetheless, Plaintiff sought to gradually continue reducing her Klonopin dosage in October 2018. (*Id.* at 544)

Included in the administrative record are treatment notes from 2019, which were not presented to the ALJ before the issuance of his written decision.[5] On April 25, 2019, Plaintiff visited the emergency room for treatment of a severe headache that had persisted for two months. (D.I. 22-1 at 4) Plaintiff associated the headache with the tapering of her Klonopin and Prozac medications. (*Id.*) A CT scan and an MRI of Plaintiff's head revealed a pituitary adenoma and white matter lesions which raised concerns of radiographic multiple sclerosis or other demyelinating disease. (*Id.* at 13-14, 16-17) Plaintiff's pituitary lab reports came back normal, and she was discharged from the hospital on April 27, 2019. (D.I. 22-1 at ¶ 3; D.I. 22-1 at 18-20)

### 2. Medical opinions

Dr. Afzal completed a medical certification form for Plaintiff in January 2017 and again in November 2017. (D.I. 11 at 652-53) On both occasions, Dr. Afzal indicated that Plaintiff was unable to work on a full-time basis, and he estimated that her panic disorder would last for six to twelve months. (*Id.*)

On May 30, 2017, Mr. Parker completed a Disability Determination Services questionnaire for Plaintiff in which he described her as anxious, depressed, angry, resentful,

---

[5] The court's summary of Plaintiff's 2019 medical records is relevant to the analysis at § III.B.5, *infra*. The court's consideration of this evidence for the limited purpose of addressing Plaintiff's arguments under 42 U.S.C. § 402(g) is permissible. *See Arce o/b/o L.A. v. Saul*, 2020 WL 2793132, at *7 (E.D. Pa. May 29, 2020) ("[I]f a plaintiff offers evidence in this court that was not presented to the ALJ, the court must address the issue of whether a new evidence remand is warranted under the sixth sentence of § 405(g)[,]" which requires a showing of materiality and good cause).

agitated, and distraught. (D.I. 11 at 398-402) He indicated that she experienced panic attacks, insomnia, and weight gain, but he confirmed that her activities of daily living were normal. (*Id.* at 399-400) As to Plaintiff's diagnoses of major depressive disorder and generalized anxiety disorder, Mr. Parker opined that her prognosis was good with continued therapy. (*Id.* at 401)

On June 15, 2017, Plaintiff's primary care practitioner completed a disability form indicating that Plaintiff could return to work on August 1, 2017. (D.I. 11 at 605, 611) Two weeks later, state agency psychologist Jane Curran opined that Plaintiff's description of her limitations was inconsistent with her treatment records and her treating practitioners' assessments of her capacity to maintain activities of daily living. (*Id.* at 85-88) The review of Plaintiff's records revealed no evidence of problems maintaining appropriate behavior and hygiene, going out independently, or interacting with others. (*Id.* at 89) Consistent with the records from Dr. Afzal and Mr. Parker, the state agency psychologist opined that Plaintiff could perform simple, routine work in a low contact setting. (*Id.*) A second state agency psychologist, Dr. Christopher King, evaluated Plaintiff's records in November 2017 and confirmed the findings of the first state agency psychologist. (D.I. 11 at 101-05)

Dr. Afzel issued the most recent opinion in the record in a letter dated August 8, 2018. (D.I. 11 at 540) The letter confirms that Plaintiff was compliant with her treatment regimen and could resume part-time work of up to 10 hours per week, with the potential to increase her hours as tolerated. (*Id.*)

### 3. Third party statements

Plaintiff's friend, Timothy Jefferson, completed a witness statement in April 2018 describing how Plaintiff requires a lot of sleep throughout the day and can only function for about two hours at a time. (D.I. 11 at 261) Mr. Jefferson also explained that Plaintiff's mood

swings, irritability, and depression interfere with her activities of daily living. (*Id.*) Plaintiff's sister, Nancy Watson, completed a witness statement the following week indicating that Plaintiff was unable to work without assistance or drive a car, and tremors in her hands affected her ability to grip objects. (*Id.* at 262) Ms. Watson explained that Plaintiff had experienced these limitations "[o]ver the past 30 years." (*Id.*)

### C. Hearing Before the ALJ

#### 1. Plaintiff' Testimony

During the May 2, 2019 hearing before the ALJ, Plaintiff testified that she lives with her three teenage children, she has a master's degree in education, and she has a driver's license, although she does not often drive. (D.I. 11 at 53-55) She testified that she last worked part-time as a fourth-grade paraprofessional for two months, ending in April 2019. (*Id.* at 56) She previously worked part-time in 2018, managing paperwork and substituting for teacher absences in her role as the assistant director of a childcare center. (*Id.* at 57)

In 2017, before her disability onset date, Plaintiff worked at the Salvation Army as a case manager, preparing case plans for individuals with mental health impairments and assisting them in applying for services. (D.I. 11 at 59-60) She previously worked as a first-grade teacher for about six months in 2015, but her responsibilities did not require her to develop lesson plans or assess student performance. (*Id.* at 61-62) Plaintiff also testified that she had experience working at a childcare center caring for preschool children, although she did not specify when or how long she worked in this role. (*Id.* at 62-63)

Plaintiff described how she experiences sluggishness on a daily basis and has trouble with ordinary activities such as bathing and preparing food. (D.I. 11 at 58) During the day, she reads and sleeps. (*Id.* at 64) She relies on her children to buy food and perform household

chores. (*Id.* at 64-65)  She attends church on a weekly basis and she goes to her medical

appointments. (*Id.* at 65, 67)  Plaintiff testified that her medications have side effects that impact

her memory and cause drowsiness. (*Id.* at 68)

### 2. Vocational Expert Testimony Before the ALJ

At the administrative hearing in May 2019, the ALJ posed the following hypothetical to

vocational expert ("the VE"):

> Now if I ask you to assume a hypothetical individual of the Claimant's age,
> education, and the past jobs that you identified.  This individual could perform
> work at all exertional levels but would be unable to climb ropes, ladders, or
> scaffolds or be exposed to hazards like unprotected heights or dangerous moving
> machinery.  Individual could perform simple, routine, and repetitive work but not
> at a production pace.  This person could occasionally interact with the general
> public, coworkers, and supervisors and can make simple work-related decisions
> with up to occasional change in work setting but could not travel to unfamiliar
> places as part of the work responsibilities.  Could this individual perform any of
> the Claimant's past relevant work?

(D.I. 11 at 73)  In response to the ALJ's hypothetical, the VE testified that such a hypothetical

individual would not be able to perform Plaintiff' past work as a case manager, elementary

school teacher, or childcare teacher. (*Id.* at 73-74)  However, the VE indicated that such a

hypothetical individual could  work as a marker, a router, or an office helper. (*Id.* at 74)

In response to questioning by Plaintiff' counsel, the VE testified that the hypothetical

individual would be precluded from all work if: (1) she had less than an occasional ability to

respond appropriately to usual work situations and to changes in a routine work setting; (2) she

were off task 20 percent or more of the work day due to medication side effects; or (3) she were

absent three or more days per month on a consistent basis. (D.I. 11 at 75)

### D. The ALJ's Findings

Based on the medical evidence in the record and the testimony by Plaintiff and the VE,

the ALJ determined that Plaintiff was not disabled under the Act for the relevant time period

from the January 18, 2017 disability onset date through the hearing date.  (D.I. 11 at 14-24)  The

ALJ found, in pertinent part:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2023.

2.  The claimant has not engaged in substantial gainful activity since January 18, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: panic attacks, agoraphobia, generalized anxiety disorder, and depressive disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant cannot climb ropes, ladders or scaffolds, and cannot be exposed to hazards like unprotected heights or dangerous moving machinery.  The claimant can perform simple, routine, and repetitive work, but not at a production pace. The claimant can occasionally interact with the general public, coworkers, and supervisors.  She can make simple work-related decisions, and can have up to occasional change in work setting.  The claimant cannot travel to unfamiliar places as part of work responsibilities.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant . . . was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

10

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 18, 2017, through the date of this decision (20 CFR 404.1520(g)).

(D.I. 11 at 16-24)

## II.    STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more than a mere scintilla" of evidence. *Id.*

## III.   DISCUSSION

### A.  Disability Determination Process

Title II of the Social Security Act "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is defined for purposes of

DIB as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if the impairments are so severe that they preclude a return to previous work or engagement in any other kind of substantial gainful work existing in the national economy. *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* at § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* at § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* at § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See id.* at § 404.1520(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See id.* at § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude an adjustment to any other available work. *See* 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

**B. Whether the ALJ's Decision is Supported by Substantial Evidence**

Plaintiff challenges the ALJ's decision in multiple respects: (1) the ALJ failed to include the impact of Plaintiff' agoraphobia in the RFC analysis; (2) the ALJ erred in accepting a non-examining state agency psychologist's report over the opinion of Plaintiff' treating psychiatrist; (3) the ALJ improperly weighed the subjective evidence; (4) the ALJ did not properly develop the record regarding Plaintiff' more recent brain pathology; (5) remand is necessary to consider additional medical evidence proximate to the hearing before the ALJ; and (6) the appointment of the prior Commissioner, Andrew Saul, violated the separation of powers. (D.I. 21 at 1)

13

### 1. Assessment of Plaintiff's agoraphobia

Plaintiff contends that the ALJ failed to make any provision in the RFC for Plaintiff's severe agoraphobia, which frequently prevents her from getting out of bed and/or out of her house. (D.I. 23 at 18)  In response, the Commissioner argues that the ALJ properly assessed Plaintiff's agoraphobia as a severe impairment, while noting that the record failed to support any additional functional limitations beyond those included in the RFC. (D.I. 30 at 14-15)

The ALJ did not err in declining to include additional RFC limitations specific to Plaintiff's agoraphobia.  The Third Circuit has described agoraphobia as "an intense, irrational fear of open spaces, characterized by a marked fear of being alone or of being in public places where escape would be difficult and may be associated with panic attacks." *Thelosen v. Comm'r of Soc. Sec.*, 384 F. App'x 86, 90 n.4 (3d Cir. 2010) (citing *Dorland's Illustrated Med. Dictionary* at 40 (30th ed. 2003)).  The ALJ accounted for this condition in Plaintiff's RFC by restricting her from travel to unfamiliar places as part of her work responsibilities and limiting her to simple work-related decisions, occasional changes in work setting, and occasional interaction with others. (D.I. 11 at 18)  Plaintiff suggests that these limitations address her other severe impairments, and not her agoraphobia. (D.I. 31 at 3-4)  But limitations on Plaintiff's work setting and interactions with others are consistent with the definition of agoraphobia. Moreover, it is widely recognized that the symptoms and resulting limitations of mental impairments often overlap.  *See Witherspoon v. Saul*, 2019 WL 5188564, at *7 n.6 (E.D. Pa. Oct. 15, 2019) (finding no error in ALJ's failure to separately identify each mental health disorder "because of their overlapping symptoms and the possibility of multiple characterizations of a patient's mental health disorder."); *see also Peter W. v. Comm'r of Soc. Sec.*, 2022 WL 523744, at *8 (N.D.N.Y. Feb. 22, 2022); *Athena G. v. Kijakazi*, 2021 WL 3729033, at *10-11 (N.D. Tex.

14

Aug. 2, 2021); *Marilyn R. v. Comm'r of Soc. Sec.*, 2019 WL 4891703, at *4 (C.D. Ill. July 18, 2019).

Substantial evidence supports the ALJ's decision not to credit Plaintiff's claim that she could not leave the house, and Plaintiff fails to identify any other limitations resulting from her agoraphobia that were not included in the RFC. The ALJ considered Plaintiff's own statements that she can drive occasionally, go to doctor's appointments, shop, spend time with family and friends, and attend church on a weekly basis. (D.I. 11 at 17-18, 21, 55, 65, 67, 226) The ALJ also considered Plaintiff's treatment notes from her frequent medical appointments outside the home, which generally confirm that she engaged normally in activities of daily living. (*See, e.g., id.* at 373-95, 413-52, 460-534) Plaintiff's demonstrated ability to engage in these activities conflicts with her own statements and those of Ms. Watson that Plaintiff has difficulty leaving her house. (*Id.* at 58-59, 64, 262) The ALJ was, therefore, entitled to credit the portions of Plaintiff's testimony that were consistent with the medical evidence and to conclude that there were no credibly established limitations regarding her alleged difficulties leaving the house. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (explaining that the ALJ can reject limitations that are asserted by the claimant but lack objective medical support if there is conflicting evidence in the record); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) ("[T]he ALJ is only required to submit credibly established limitations.").

### 2.  Assessment of medical opinion evidence

Plaintiff argues that the ALJ erred in crediting the reports of two non-examining state agency psychologists over the opinions of her treating psychiatrist. (D.I. 23 at 18-19) But the Commissioner correctly explains, and Plaintiff does not dispute, that the treating source rule does not apply to Plaintiff's DIB claim, which was filed after the enactment of 20 C.F.R. § 404.1520c

15

in March 2017.  (D.I. 30 at 16-17; D.I. 31 at 5)  Under the new regulations, the ALJ need not

"defer or give any specific evidentiary weight, including controlling weight, to any medical

opinion(s) . . ., including those from [the claimant's] medical sources."  20 C.F.R. §

404.1520c(a).

Plaintiff submits that the ALJ failed to consider 20 C.F.R. § 404.1520c(c)(5), which

addresses the consideration of "other factors that tend to support or contradict a medical

opinion[.]"  (D.I. 23 at 19)  Such factors include, among other things, the medical source's

understanding of the applicable policies and evidentiary requirements.  20 C.F.R. §

404.1520c(c)(5).  Here, the ALJ indicated that the state agency consultants' opinions were

"based upon . . . a comprehensive understanding of agency rules and regulations."  (D.I. 11 at

21-22)  Plaintiff challenges the accuracy of this statement, suggesting that "it is highly

questionable that these consultants can be said to be familiar with agency rules and regulations."[6]

(D.I. 23 at 19)  But this was not the only—or even the primary—factor considered by the ALJ in

determining that the opinions of the state agency consultants were persuasive.  Instead, the ALJ

focused on the internal consistency of the state agency consultants' opinions and their

consistency with Plaintiff's treatment records as a whole, as well as the supportability of those

opinions "by a reasonable explanation and the available evidence[.]"  (D.I. 11 at 22)

Substantial evidence supports the ALJ's assessment of the state agency consultants'

opinions in this regard.  Treatment notes from Dr. Afzal consistently confirm that Plaintiff's

---

[6] In support of her contention, Plaintiff cites a November 9, 2021 report published by the
Government Accountability Office, which suggested that the qualifications and knowledge of
state agency doctors are often not appropriately vetted in accordance with the policy of the
Social Security Administration.  (D.I. 23 at 19)  However, Plaintiff offers no evidence to suggest
that the state agency consultants who rendered opinions in this particular case lacked the
requisite qualifications or familiarity with agency rules and regulations.

cognitive functioning, fund of knowledge, short- and long-term memory, judgment, and abstract thinking remained intact, and Plaintiff was friendly, attentive, cooperative, and communicative during her visits. (D.I. 11 at 413-50, 529-33, 542-70)  These assessments support the conclusions of the state agency consultants and the ALJ that Plaintiff could understand and remember simple instructions and adapt to simple changes in a low contact work setting. (*Id.* at 21, 88-89, 102-04)  Accordingly, the ALJ satisfied the regulatory requirement to articulate his supportability and consistency findings under 20 C.F.R. § 404.1520c.  There is no corresponding requirement that the ALJ discuss the remaining factors.[7] *See* 20 C.F.R. § 404.1520c(b)(2); *Bordner v. Kijakazi*, 2022 WL 178818, at *4 (M.D. Pa. Jan. 18, 2022).  Nonetheless, the ALJ in this case acknowledged that the state agency consultants were non-treating, non-examining medical sources, and he thoroughly discussed the records of Plaintiff's treating providers to supply context regarding their specialties and the length and nature of their treatment relationships with Plaintiff and to explain the weight given to each opinion. (D.I. 11 at 20-22); 20 C.F.R. § 404.1520c(c)(3)-(4).

Plaintiff contends that the state agency consultants did not have the benefit of reviewing any medical records after November 2017, and the ALJ's assignment of persuasive value to those opinions was therefore erroneous. (D.I. 23 at 19)  But the Third Circuit has recognized

---

[7] Plaintiff posits that, despite the language of § 404.1520c(b)(2) absolving the ALJ of expressly discussing factors beyond supportability and consistency, this Court should reimpose an articulation requirement regarding those factors. (D.I. 23 at 20-21; D.I. 31 at 5)  The ALJ is legally bound to follow the regulations. *See Orr v. Comm'r of Soc. Sec.*, 805 F. App'x 85, 87 (3d Cir. 2020); *Wright v. Colvin*, 2016 WL 446876, at *1 (M.D. Pa. Jan. 14, 2016).  Plaintiff cites no authority suggesting that this Court may remand the case to the ALJ with instructions to impose an articulation requirement that expressly contradicts the applicable regulations.  As discussed herein, the ALJ explained why he found certain opinions more persuasive than others based on citations to the evidentiary record.  He did not "reject evidence for no reason or the wrong reason" in this regard. *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993).

that, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Here, the ALJ considered Plaintiff's medical records post-dating the state agency consultants' opinions and determined that, although Plaintiff experienced some withdrawal symptoms and persistent anxiety, she continued to exhibit overall normal findings on mental status examination, and she was able to work fourteen hours per week. (D.I. 11 at 21) Specifically, the ALJ noted that Plaintiff "exhibited intact memory, normal cognitive functioning, insight and judgment, no signs of hyperactive or attentional difficulties, normal attention and behavior, but with signs of anxiety" in her treatment records throughout 2018. (*Id.*) The ALJ expressly considered these subsequent treatment records in conjunction with the state agency consultants' opinions and determined that the records and opinions were consistent. (*Id.* at 21-22) Thus, substantial evidence supported the ALJ's decision to credit the opinions of the state agency consultants despite the age of those opinions. *See Chandler*, 667 F.3d at 361 ("Only where 'additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing,' is an update to the report required." (citing S.S.R. 96-6p, 1996 WL 374180, at *4 (July 2, 1996)).

Plaintiff also challenges the ALJ's finding that the opinion of Plaintiff's treating psychiatrist, Dr. Afzal, was less persuasive. (D.I. 23 at 18-19) But the ALJ correctly stated that Dr. Afzal's opinions regarding Plaintiff's ability to work address an issue reserved for the Commissioner. (D.I. 11 at 22) Accordingly, the ALJ was not obligated to assign any weight to

Dr. Afzal's statements that Plaintiff would not be able to work on a full-time basis for six to

twelve months, or that she could work on a part-time basis for ten hours per week. *See Hoyman*

*v. Colvin*, 606 F. App'x 678, 680-81 (3d Cir. 2015).

Moreover, substantial evidence supports the ALJ's conclusion that Dr. Afzal's opinion

was inconsistent with Plaintiff's treatment records and the opinions of the state agency

consultants and Ms. Beiso. (D.I. 11 at 22)  The ALJ cited ongoing treatment records from Dr.

Afzal showing conservative treatment, stable or improved symptoms, normal activities of daily

living, and a good prognosis with continued therapy. (*Id.* at 22, 413-50, 542-70)  Even on

occasions when Plaintiff's symptoms worsened, Dr. Afzal noted that her cognitive functioning,

memory, and judgment remained intact. (*Id.* at 447)  The ALJ observed that Ms. Beiso's

opinions were also inconsistent with Dr. Afzal's assessments because she suggested that Plaintiff

could return to work only a few months after her disability onset date. (*Id.* at 22, 605, 611)

Indeed, Ms. Beiso completed a health appraisal form clearing Plaintiff to work in a childcare

position. (*Id.* at 593)  Likewise, Dr. Afzal's opinion that Plaintiff could only work part-time is

inconsistent with the opinions of the state agency consultants that Plaintiff was not disabled. (*Id.*

at 85-91, 100-05)

### 3.  Assessment of the subjective evidence

Plaintiff challenges the ALJ's use of boilerplate language in assessing Plaintiff's

subjective complaints, arguing that the ALJ was required to either credit Plaintiff's subjective

complaints or point to other credible medical opinions refuting those complaints once he found

that her medically determinable impairments could cause her symptoms. (D.I. 23 at 21-22)  The

Commissioner responds that the ALJ properly considered inconsistencies within Plaintiff's own

statements, as well as treatment notes that did not support the severity of symptoms claimed by

Plaintiff and evidence showing that Plaintiff was able to work during the relevant time period. (D.I. 23 at 22-24)

The ALJ's analysis of Plaintiff's subjective complaints is in keeping with the applicable standard set forth in Social Security Ruling 16-3p,[8] which requires examination of "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." S.S.R. 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017).

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (D.I. 11 at 19-20)  Cases involving similar "boilerplate" language have held that an ALJ's assessment of a claimant's credibility is supported by substantial evidence when it is based on a thorough examination of the overall record revealing issues such as inconsistencies in the claimant's testimony and minimal clinical findings. *See Schuster v. Astrue*, 879 F. Supp. 2d 461, 471 (E.D. Pa. 2012); *see also Kellie F. v. Kijakazi*, 2022 WL 203242, at *16 (D.N.J. Jan.

---

[8] Plaintiff relies on the Third Circuit's line of cases addressing the evaluation of a claimant's subjective complaints of physical pain. (D.I. 23 at 21-22) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993); citing *Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116 (3d Cir. 2016); *Zielinski v. Astrue*, 2013 WL 6547229 (M.D. Pa. 2013)).  Plaintiff's allegations in this case concern her mental impairments, as opposed to physical pain.  At least one district within the Third Circuit has declined to extend this line of cases to cases involving subjective complaints of mental impairments. *See Warren v. Astrue*, 2008 WL 4748349, at *7 (E.D. Pa. Oct. 29, 2008) ("The Third Circuit has not extended *Mason* . . . principles beyond subjective complaints of pain; therefore, this court also declines to do so.").  Other courts within the Third Circuit have not drawn this distinction. *See, e.g., Brenizer v. Astrue*, 2012 WL 4006238, at *5 (W.D. Pa. Sept. 12, 2012).

24, 2022).  Reliance on boilerplate language does not inevitably lead to a deficient administrative analysis where, as here, the ALJ proceeds to consider the evidence on the record as a whole.

Immediately following the boilerplate language, the ALJ proceeds to consider "claimant's statements about the intensity, persistence, and limiting effects of . . . her symptoms" in the context of "the totality of the evidence of record."  (D.I. 11 at 20)  This includes consideration and analysis of Plaintiff's hearing testimony and written statements, third-party statements, the opinions of state agency consultants and Plaintiff's providers, Plaintiff's work history during the relevant time period, and treatment records revealing a conservative course of treatment and overall stable mental status findings.  (*Id.* at 16, 19-22)  For the reasons previously discussed at § III.B.1-2, *supra*, substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints are not entirely consistent with this evidence.  Contrary to Plaintiff's suggestion, the ALJ did not rely on his own lay opinion in rejecting her subjective complaints.  (D.I. 23 at 22)  Rather, the ALJ relied on contradictory medical and other evidence that included, among other things, the conservative nature of Plaintiff's treatment and stable mental status examination findings.  (D.I. 11 at 19-22)  Because the Commissioner's decision regarding Plaintiff's subjective complaints is supported by substantial evidence, it will be affirmed in this regard.

### 4.  Duty to develop the administrative record

Plaintiff next argues that the ALJ had a duty to develop the record once Plaintiff testified that she had recently been seen in the hospital for brain pathology, which may contribute to Plaintiff's mental health problems.  (D.I. 23 at 23-24)  The Commissioner responds that the ALJ was not obligated to consider any evidence submitted later than five business days before the

hearing, and Plaintiff did not submit any additional written evidence at the hearing. (D.I. 30 at 25)

The ALJ did not err in failing to further develop the record in this case. Under the regulations, a claimant must submit any evidence to the ALJ no fewer than five business days before the scheduled administrative hearing. 20 C.F.R. § 404.935(a); *Delpizzo v. Saul*, 2021 WL 2651949, at *13-14 (D.N.J. June 28, 2021). There is no dispute in this case that Plaintiff did not submit written evidence of her 2019 emergency room visit for consideration by the ALJ at any point in the administrative proceedings, nor did she request postponement of the hearing before the ALJ. Instead, Plaintiff submitted the written evidence for the first time to this court on appeal in December 2021 in conjunction with the filing of her summary judgment motion. (D.I. 22-1) Plaintiff suggests that an exception to the five-day rule applies under 20 C.F.R. § 404.935(b)(3) because her inability to submit the evidence in a timely manner was due to "[s]ome other unusual, unexpected, or unavoidable circumstance" beyond her control which prevented her from informing the ALJ about the evidence or submitting the evidence earlier. (D.I. 23 at 24 n.23); 20 C.F.R. § 404.935(b)(3). But Plaintiff does not offer any explanation or identify any efforts made to submit her emergency room records to the ALJ prior to the date of the written decision. The exceptions to the five-day rule apply only to the ALJ's consideration of untimely evidence and, in this case, it is undisputed that the ALJ was never presented with the written records from Plaintiff's 2019 emergency room visit.

The crux of Plaintiff's argument is that the ALJ had a duty to independently develop the record regarding her emergency room visit after Plaintiff mentioned it in her testimony during the administrative hearing. (D.I. 23 at 23-24) The ALJ has a duty to develop the medical record, but the duty only arises when there is insufficient evidence to make a rational decision. *See*

*Conley v. Colvin*, 2016 WL 3436435, at *10 (D. Del. June 20, 2016) (citing *Clark v. Shalala*, 28 F.3d 828 (8th Cir. 1994)).  Plaintiff has not established that the evidence before the ALJ was insufficient to render a decision.

Moreover, the ALJ's duty to develop the administrative record does not absolve Plaintiff or her counsel of all responsibility for developing the record. *See Turby v. Barnhart*, 54 F. App'x 118, 122-23 (3d Cir. 2002) (explaining that the ALJ's duty to develop the record "is most acute where the claimant is unrepresented[.]"); *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1144-45 (N.D. Ill. 2012) (finding that neither plaintiff nor counsel made an effort to submit proof in the month following the hearing and instead "simply contented themselves with idle and irresponsible castigation of the ALJ.").  Statements made by Plaintiff's counsel during the hearing indicate that counsel was in possession of Plaintiff's discharge papers at the time of the hearing, yet no motion was made to submit them into evidence or continue the hearing.  (D.I. 11 at 53) ("[S]o her testimony will be she had a brief inpatient stay at the end of April and she just brought the discharge papers for me to look at to see what it was all about.  And it turns out that she was diagnosed with migraine headache.").  On this record, the ALJ had no duty to further develop the evidence regarding Plaintiff's 2019 emergency room visit. *See Clark v. Astrue*, C.A. No. 12-1116-RGA, 2013 WL 4407880, at *1 (D. Del. Aug. 15, 2013) (concluding that ALJ did not err in failing to consider evidence arising after the administrative hearing where the claimant was represented by counsel, no request for a continuance was made, and the ALJ had sufficient evidence to issue a decision).

### 5. Duty to consider additional medical evidence

In the alternative, Plaintiff seeks relief pursuant to the sixth sentence of 42 U.S.C. §
405(g), which provides that the court may remand the case for consideration of additional
evidence.  (D.I. 23 at 25)  Plaintiff suggests that the 2019 emergency room records submitted in
conjunction with her motion for summary judgment support a theory that her pituitary disorder
may be correlated to her panic disorder.  (*Id.* at 26-28)  However, Plaintiff concedes that this
remedy "is very infrequently applied."  (D.I. 31 at 9)

Under the sixth sentence of § 405(g), a court may remand an agency determination to
require the ALJ to consider new evidence only if the claimant establishes "that there is new
evidence which is material and that there is good cause for the failure to incorporate such
evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  Putting aside the issue of
whether the evidence is "new," Plaintiff has not met the good cause or materiality standards here.
Counsel was in possession of Plaintiff's discharge papers at the time of the hearing.  (D.I. 11 at
53)  This testimony contradicts Plaintiff's explanations for her failure to acquire any additional
medical documentation prior to the administrative hearing, and it establishes that Plaintiff cannot
make the necessary showing of good cause.  *See Scatorchia v. Comm'r of Soc. Sec.*, 137 F.
App'x 468, 472 (3d Cir. 2005) (observing that remands for each item of new and material
evidence "would open the door for claimants to withhold evidence from the ALJ in order to
preserve a reason for remand.").  Moreover, Plaintiff has not shown that the new evidence is
material because a review of the emergency room records fails to establish a relationship
between Plaintiff's headaches and her mental impairments.  (D.I. 22-1)  Plaintiff's speculation
that this diagnosis could be an underlying cause of her mental impairments finds no support in

the records themselves.  (D.I. 23 at 26-28)  Consequently, Plaintiff has not shown that her 2019 emergency room records were likely to change the ALJ's decision.

### 6.  Constitutionality of the Commissioner's appointment

Plaintiff alleges that the ALJ's determination in this case is constitutionally defective because the appointment of the former Commissioner, Andrew Saul, violated the Appointments Clause of the Constitution.  (D.I. 23 at 29-30)  Specifically, Plaintiff contends that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent that it limits the President's authority to remove the Commissioner without cause.  (*Id.*)  Plaintiff acknowledges in her reply brief that she "is not aware of any case in which relief has been granted based upon these arguments although it certainly seems that such should be granted."[9]  (D.I. 31 at 2)

The Commissioner concedes that 42 U.S.C. § 902(a)(3) violates the separation of powers. (D.I. 30 at 4)  Nonetheless, the Commissioner argues that an unfavorable decision by the ALJ cannot be set aside in this case because Plaintiff has not shown that the unconstitutional statutory removal restriction actually caused her harm.  (*Id.* at 5-10)  The Supreme Court has determined that the unlawfulness of a removal provision does not strip [an official] of the power to undertake the other responsibilities of his office[.]" *Collins v. Yellen*, 141 S. Ct. 1761, 1788 n.23 (2021) (citing *Seila Law LLC v. C.F.P.B*, 140 S. Ct. 2183, 2207-11 (2020)).  Accordingly, "plaintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision." *Id.* at 1801 (Kagan, J., concurring).  Plaintiff does not articulate how the President's inability to

---

[9] On the other hand, the Commissioner has provided string citations to numerous cases in which District Courts across the country have rejected remands for lack of a connection to the ALJ's determination. *See, e.g.*, *Kowalski v. Kijakazi*, 2022 WL 526094, at *9-12 (M.D. Pa. Feb. 22, 2022); *High v. Kijakazi*, 2022 WL 394750, at *5-6 (E.D. Pa. Feb. 9, 2022); *Mor v. Kijakazi*, 2022 WL 73510, at *3-5 (D.N.J. Jan. 7, 2022).

remove the Commissioner without cause affected the ALJ's disability determination in this case. *See Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) ("[T]here is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."). Absent a showing of actual harm, Plaintiff cannot prevail on this issue.

Moreover, the Commissioner submits that the ALJ in this case had his appointment ratified in July 2018 by former Acting Commissioner of Social Security Berryhill, who did not enjoy statutory tenure protection, was not subject to § 902(a)(3)'s removal restriction, and could have been removed by the President at any time. (D.I. 30 at 6-7) And the ALJ's decision in this case issued on May 20, 2019, about a month before Andrew Saul took office as the Commissioner. (*Id.* at 7) Plaintiff does not challenge these assertions. Under similar circumstances, courts have determined that constitutional removal restriction arguments do not apply. *See Boger v. Kijakazi*, 2021 WL 5023141, at *3 n.4 (W.D.N.C. Oct. 28, 2021); *see also Standifird v. Kijakazi*, 2021 WL 5634177, at *4 (S.D. Cal. Dec. 1, 2021); *Perez-Kocher v. Comm'r of Soc. Sec.*, 2021 WL 6334838, at *6 (M.D. Fla. Nov. 23, 2021).

The Commissioner alternatively argues that Plaintiff's request for a rehearing based on the Appointments Clause deficiency should be denied under the harmless error doctrine, the de facto officer doctrine, the rule of necessity, and broad prudential considerations. (D.I. 30 at 10-13) Having determined that the unconstitutional statutory removal restriction did not actually cause Plaintiff harm, the court need not reach these alternative arguments.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment (D.I. 22) is

DENIED, and the Commissioner's cross-motion for summary judgment (D.I. 28) is GRANTED.

An Order consistent with this Memorandum Opinion shall issue.

Dated:  April 5, 2022

Sherry R. Fallon
United States Magistrate Judge